## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

ANTHONY CLARK,

       *Plaintiff*,

v.

DONALD M. BENTON, DIRECTOR,
UNITED STATES SELECTIVE
SERVICE SYSTEM
U.S. Selective Service Headquarters
1515 Wilson Boulevard,
Arlington, VA 22209-2425,

Serve:

  William P. Barr
  United States Attorney General
  United States Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530

  G. Zachary Terwilliger
  United States Attorney for the
  Eastern District of Virginia
  2100 Jamieson Avenue
  Alexandria, VA 22314

       *Defendant*.

Case No. _____

Jury Trial Requested

### CIVIL COMPLAINT FOR EQUITABLE AND
### MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Anthony Clark submits this claim for unlawful removal in violation of the Civil Service Reform Act, pursuant to 5 U.S.C. § 7512(1) and 5 C.F.R. § 1201.3(a)(1) and unlawful retaliation in violation of the Whistleblower Protection Act, 5 U.S.C. §§ 2302(b)(8) and 2302(b)(9). Clark requests a jury trial for all counts so proper to be tried.

### PARTIES

1.      Anthony Clark is a 54-year-old, African American veteran of the United States Army who was an employee the United States Selective Service System through November 15, 2019 as IT Supervisor/Chief Information Security Officer and later an IT Specialist.

2.      Defendant Donald M. Benton is the Director of the United States Selective Service, which is an independent agency within the Executive Branch of the United States Government.

## JURISDICTION AND VENUE

3.      This Court has subject matter over this complaint under 28 U.S.C. § 1331 because it is an action arising under the laws of the United States of American, namely, the Civil Service Reform Act, 5 U.S.C. § 7513, *et seq*. and the Whistleblower Protection Act, 5 U.S.C. §§ 2302(b)(8) and 2302(b)(9), *et seq*.

4.      This Court has subject matter jurisdiction over this complaint under 5 U.S.C. § 7703(b)(2) because Plaintiff Anthony Clark filed an appeal of an appealable action in the Merit Systems Protection Board on December 12, 2019 that asserted that his removal was based, in part, on unlawful discrimination based upon race.

5.      In the same MSPB Appeal, Clark also asserted that his removal violated the Civil Service Reform Act, 5 U.S.C. § 7513(a), *et seq*. and that his removal was based, in part, on unlawful retaliation in violation of the Whistleblower Protection Act, 5 U.S.C. §§ 2302(b)(8) and 2302(b)(9).

6.      On February 25, 2020, an administrative judge for the MSPB issued an initial decision dismissing Clark's complaint without prejudice, subject to automatic refiling by the Board, pending confirmation by the United States Senate of a sufficient number of Board Members to re-establish a quorum at the MSPB.

2

7. On March 31, 2020, the Board's initial decision to dismiss without prejudice became final.

8. Clark may seek consolidated judicial review of claims raised in a mixed-case appeal in an appropriate United States District Court. *See Perry v. Merit Systems Protection Board*, 137 S.Ct. 1975, 1985-88 (2017).

9. This Court has personal jurisdiction over Defendant Donald M. Benton because he is the Director of the United States Selective Service, and the Agency's headquarters are located in this judicial district at 1515 Wilson Boulevard, Arlington, Virginia 22209-2425.

10. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e) because the Agency's headquarters is located in this district, and this is the judicial district in which a substantial part of the alleged unlawful acts occurred.

## FACTUAL ALLEGATIONS

11. Clark is a 21-year veteran of the United States Army, and he a recipient of the Bronze Star for his wartime service. Clark is also an expert in information technology and in IT security issues.

12. Clark is a Certified Network Defense Architect, a CISCO Certified Network Associate, a CISCO Certified Network Associate Security, a Certified Computer Forensic Examiner, Certified Expert Penetration Tester, Microsoft Certified Professional, Certified Data Recovery Professional and a Certified Ethical Hacker.

13. The Selective Service hired Clark in May 2009.

14. Until Selective Service Deputy Director John Prigmore ("Prigmore") placed Clark on a "special detail" in May 2019, Clark served as the Agency's Chief Information Security Officer (CISO).

15.     At the time that Prigmore proposed his removal, Clark was the only African-American in an IT management position at Selective Service headquarters.

16.     In order to carry out the Agency's mission to register, and in the event of a draft equitably call males ages 18-25 to military service, the Selective Service holds and maintains Personally Identifiable Information (PII) on over 85 million men in the United States of America.

17.     As Chief Information Security Officer for the Agency, Clark was responsible for protecting the Agency and the data it maintains on millions of Americans from potential hackers and other cybersecurity threats.

18.     Clark had a distinguished career of highly-rated performance at the Selective Service prior to the appointment of Brian Zimmer and David Soucie.

19.     In or about March 2018, the Selective Service switched to a new email server.

20.     On a Saturday, in or about March 2018, David Soucie, one of Clark's subordinates at that time, entered Clark's office in a panic. Soucie told Clark that Soucie "searched for a solution on the Internet to an issue he was trying to resolve." Soucie had entered a command he found via Google on the live production system. The command Soucie entered caused many government emails to be wiped out of about 90 percent of Agency email accounts. Maintenance of the email server was not a project on which Soucie was supposed to work that day.

21.     Clark was then in a main participant in efforts by the Agency to attempt to mitigate the damage of Soucie's actions. It took about three months for the Agency to complete the repair and recovery. These actions severely limited the Selective Service's functions for several months.

22.    After the "email incident" in March 2018, Deputy Chief Information Officer Brian Zimmer began to bestow considerable amounts of praise on Soucie's work, despite the serious errors Soucie had committed.

23.    In or about June 2018, Clark had to write an evaluation for Soucie. By this time, and in addition to the email server issue in March 2018, Clark had discovered that Soucie had left a server vulnerable to attack from inattention. As CISO, Clark had serious concerns about the harm to the Agency and to the public that might result from Soucie's actions.

24.    Clark met with Benton in about early June 2018. Benton told Clark that Benton hoped Clark would "take it easy" on Soucie. Clark later issued a neutral evaluation to Soucie that detailed these issues.

25.    Soucie had also previously received a reprimand from the former Operation Associate Director and former Acting Director Adam Copp, who is a member of the Senior Executive Service. Soucie became enraged by Clark's evaluation, as well as the verbal reprimand he received from Copp.

26.    Clark and Soucie met on or about July 17, 2018. Soucie informed Clark that he believed Clark was "bad at [his] job." Soucie also told Clark that he "would pay him back for this" in regard to the evaluation.

27.    In late spring and early summer 2018, Clark began to receive feedback from other employees that Brian Zimmer had engaged in a series of discussions about Clark to management officials. Employees began to ask Clark questions to the effect of, "What does Zimmer have against you?" Clark also received reports that Zimmer had questioned employees in the presence of Deputy Director John Prigmore in an apparent attempt to undermine Clark's performance and integrity.

28.     Equally concerning to Clark were comments that Zimmer made in Clark's presence. Zimmer made comments to Clark to the effect of, "You know how unruly black kids are. But I don't mean your kids." Zimmer also told Clark that he knew he "needed to stay on [his] good side."

29.     Later in about August 2018, Zimmer asked Clark to identify a company that might be able to handle the disposal of IT and electronic equipment. When Clark identified a company in Arlington, Virginia with whom he had previously worked, Zimmer responded with words to the effect of, "Well, this just looks like a bunch of Hispanics with hammers." Clark understood this reference to relate to the relatively sizeable Latino community in parts of Arlington, Virginia, and he understood the reference to "hammers" to imply a lack of competence on the part of the people that Zimmer perceived to be "Hispanics," as IT destruction is often a complicated process.

30.     Zimmer also made comments to the effect that the agency should "hire more Asians because they are so good at math." And Zimmer further stated that the Agency should "hire Russians because they're good with computers and hacking."

31.     On July 8, 2018, Clark sent Director of the Selective Service Donald M. Benton an email in which Clark outlined his concerns with Zimmer's IT suggestions. Clark also reported that he believed Zimmer had begun to target him and had engaged in a campaign of disparaging his work to Prigmore. In the same email, Clark stated his concerns about inappropriate comments based upon race in his presence.

32.     Benton responded to Zimmer on July 20, 2018. Benton replied that he believed Clark misperceived Zimmer's actions toward him. Benton also thanked Clark for his work in

helping Benton to obtain a larger IT budget for the Agency. And Benton further told Clark that he should "put away personal ego and pride."

33.     Clark attempted to engage the EEO process in July 2018. In doing so, he met with a counselor named Irish Massey. Clark reported what he believed to be targeting and harassment based on his race by Zimmer. Massey told Clark that he "had no case" because "they haven't done anything to you." Clark told Massey that he wanted to pursue the claim anyway. Massey then accused Clark of "being sexist" because he did not trust her opinion that he "had no case." Massey also accused Clark of doubting her because she was a woman. Massey later informed Clark that she contacted a "higher-up" in EEO, and that person purportedly confirmed to her that Clark "had no case." Clark took no further action with the EEO at that time.

34.     On August 15, 2018, John Prigmore announced via email that the Agency would appoint Brian Zimmer as Acting Deputy Chief Information Officer.

35.     On or about August 21, 2018, Clark met with Prigmore to discuss his concerns about Zimmer. Specifically, Clark disclosed the comment about "a bunch of Hispanics with hammers." Clark also detailed the concerns about other racist comments and tropes he had heard Zimmer use in meetings. Clark further told Prigmore that a contractor named Glen LaMothe had reported to him that Zimmer also made inappropriate comments about race to LaMothe.

36.      Prigmore reacted with a statement to the effect of, "Are you making this up?" Prigmore then said of Zimmer, "Well, you know he is old school."

37.     On or about August 31, 2018, Clark met with Neil Dorsey and Soucie. The purpose of this meeting was for Dorsey to mediate between Clark and Soucie, especially as it concerned Clark's rating of Soucie. During the meeting, Soucie admitted to Clark and Dorsey that he had recently been in a meeting in Prigmore's office with Zimmer, Prigmore, Soucie, and

7

Chief of Staff Wadi Yakhour. Soucie stated that Zimmer first referred to "a bunch of Obama flunkies," but the conversation on Zimmer's part quickly turned to race. Soucie reported that Zimmer referred to Clark using a racial slur. Soucie also told Clark and Dorsey that he later joined Zimmer privately in Zimmer's office during which Zimmer said, "very bad things about the color of [ Clark's] skin."

38.     Soucie further told Clark that about two days later, Prigmore called him into his office and said, "I heard you had some conversations with Zimmer. Did you talk to anyone about this?" Soucie reportedly told Prigmore that he had not discussed the matter with anyone, but Soucie told Clark and Dorsey that he discussed these events with Perry Chaplin.

39.     Also, on or about August 31, 2018, Benton sent Clark a directive by email regarding the use of "Atomic Eye" and "Landesk" on the Agency's IT systems. Benton stated that the programs ran on the Agency's IT systems constantly, and Benton said that the programs slowed down functionality of the Agency's IT systems. Benton ordered Clark to stop running the programs during business hours, and Benton said that such programs could only be run after hours. Benton further instructed Clark to consider whether the program BitDefender should run on the systems during business hours.

40.     Clark responded later that afternoon and affirmed that he would turn off the protections as directed. Clark noted in his response, however, that he did not recommend this action. Later that day, Zimmer later sent an email to Clark, which he apparently intended to send instead to Benton, in which Zimmer accused Clark of having "not been thoughtful" in his response. In his email, Zimmer alleged that Clark had "cut off everything." Zimmer went on to allege that Clark had taken this action deliberately in an effort to create a security vulnerability for which Benton would ultimately have to take blame.

41.     In reality, Clark did not terminate the functionality of either program and awaited Benton's response and instructions in light of the concerns he had raised.

42.     In or about Fall 2018, Zimmer and Prigmore placed Soucie in the role of Network Administrator. Soucie and Zimmer became responsible for day-to-day operations of the network. Clark remained the CISO, and he still had oversight over security aspects of the Agency's IT systems. But Soucie began to redesign networks often without Clark's consultation as to security matters.

43.     In or about February 2019, Clark once against contacted the EEO. He filed a complaint in which he alleged a hostile work environment based on race, race discrimination, and retaliation. Clark then filed a formal EEO Complaint on or April 17, 2017. The EEO investigation is now complete, and Clark requested a hearing before an EEOC administrative judge.

44.     At or about 7:00 PM on or about March 21, 2019, Clark received a telephone call from Perry Chaplin who stated that the SSS headquarters network had stopped functioning. On a troubleshooting call, Chaplin informed Clark that Soucie planned to remove what is known as the Demilitarized Zone (DMZ) Switch. The DMZ physically separates sensitive internal networks from external networks such as the Internet at-large.

45.     In response, Clark told Soucie that the government generally requires a physical separation or DMZ Switch between networks. Clark also told Soucie that such changes should be carefully planned. Clark further stated that, as the Chief Information Security Officer, Clark should have been informed of any plan to remove the DMZ switch. Later that evening, Clark went to the SSS headquarters to troubleshoot. While at the office, Clark discovered that Soucie had reconfigured the networks so that outside traffic could avoid the Agency's firewall. Clark

noted that this action created the potential for a significant security issue. Clark ultimately restored connectivity around 11:00 PM that night.

46.    Clark then sent a memorandum to Benton on or about March 22, 2019, which was the next day, regarding the incident on March 21, 2019. In that memorandum, Clark stated that he learned at about 7:00 PM on the previous day that the network had been down since about 5:30 PM on March 21, 2019, and he also learned the website had been down since about 3:30 PM. Clark explained in his memorandum that he had told Soucie that Soucie's plan to remove the DMZ switch posed a significant risk of harm. Clark described in this memo that the actions taken by Soucie could have caused significant harm to the agency by allowing a malicious actor to access the network and view the personal information contained in the over 85 million records the Agency holds. Specifically, Clark wrote, "I am truly disturbed that this could have placed the Director in a position to stand in front of Congress and explain why 85 million plus records was accidentally stolen due to rogue IT Specialist deciding what was best for the Agency and bypassing IT security expertise, and configuration management requirements."

47.    Also, on or about March 21, 2019, the security cameras at Selective Service headquarters failed. Clark first learned of the camera outage on or about March 28, 2019. Upon learning of the outage, Clark went to the server room, and he found that the cameras had been plugged into the wrong port either by Soucie or by a contractor named Anthuan Nguyen. Clark moved the connection to the correct port, and the camera functionality was then restored.

48.    On or about March 29, 2019, Clark met with Soucie, Chaplin, and Prigmore. In the meeting, Clark discussed Zimmer's performance. Additionally, there was a discussion about the Sidewinder firewall, on which the Agency was supposed to receive support and management from the contractor CenturyLink. Clark reported that CenturyLink had not effectively monitored

the firewall. And Clark said that he thought CenturyLink owed the Agency a refund. Clark had raised the issued at least two years prior, and CenturyLink had failed to fix the issue. During that time, Clark followed up with CenturyLink, but CenturyLink never responded adequately. In CenturyLink's absence, Clark managed the firewall.

49.     On or about April 17, 2019 Prigmore recommended to Benton that Prigmore be terminated as soon as possible for "misbehavior." Benton declined to follow Prigmore's recommendation and chose to counsel Zimmer instead.

50.     Throughout April 2019, Clark worked with CenturyLink to attempt to reconnect CenturyLink to the Agency's Sidewinder Firewall. The connection took at least two weeks to reestablish. The breakdown in the ability to connect came from problems with the protocols that could not be resolved easily. The firewall vendor, Sidewinder, had to come to Agency headquarters to attempt to find a resolution to the issue. The inability of the firewall to connect with CenturyLink was unlike any that either Clark or the technicians from CenturyLink had ever seen.

51.     The vendor, Sidewinder, eventually had to establish a workaround. Clark provided proposals and attempted to work cooperatively with CenturyLink. Later, in a memorandum regarding his investigation into Clark's conduct, Prigmore specifically noted that the email from CenturyLink on April 16, 2019 said "(Anthony et al.) are very responsive and we are exchanging information regularly."

52.     On or about May 9, 2019, Clark sent Benton a memorandum. In that memorandum, Clark discussed a "network change incident." In it, Clark stated that Glen LaMothe asked Clark to go into the server room because the network was down. Clark detailed

in the letter that he discovered that the main external network connection from CenturyLink had been plugged into the internal switch, which meant that there was a bypass of the firewall.

53.     In the same memorandum, Clark also explained that he discovered that the security connection device to the QRadar system had been connected improperly, which meant the Agency could not collect data to determine potential threats to the network. Clark state that this configuration violated the FIPS 200 standards as published by the National Institute of Standards and Technology, and he disclosed what he reasonably believed to be the potential risk to security posed by the configuration.

54.     On or about May 14, 2019, Clark met with Soucie and Prigmore in the server room. The purpose of the meeting was to review the network configuration. Clark continued to state that he believed Soucie's configuration put the Agency's security at risk. Later that day, after the meeting, Clark wrote an email to Prigmore. In that email, Clark stated that he took security seriously, and he said that he wanted to ensure that he exercised due diligence as the Chief Information Security Officer to ensure the integrity of the data that Selective Service holds.

55.     In the same email, Clark reiterated that he believed that the configuration in place, as directed by Soucie and Zimmer, was inadequate to meet security challenges faced by the Selective Service. Clark also stated that he would personally alert Benton of his concerns. And Clark further wrote that Soucie made false and inaccurate claims about Clark's integrity.

56.     Later that evening, on or about May 14, 2019, Prigmore assigned Clark to four days' administrative leave. As a result, Clark was out of the office on May 15, 2019, May 16, 2019, May 17, 2019, and May 20, 2019.

57.    Clark then disclosed his concerns in an email to Benton on or about May 22, 2019. In Clark's email to Benton, Clark explained that the new configuration put in place by Soucie and Zimmer had necessary layers of protection missing. Clark wrote that the configuration made it hard to detect potential attacks or malicious traffic. Clark also stated that he believed the configuration violated Federal Information Security Management Act regulations and NIST regulations.

58.    On or about May 21, 2019, Prigmore placed Clark on a "special detail." As part of this detail, Clark had to complete specific projects and report only to Prigmore. The detail also banned Clark from access to the network or firewall pending an investigation.

59.    Additionally, on May 21, 2019, Prigmore informed Zimmer that Prigmore intended to take disciplinary action against Zimmer for "repeated instances of misbehavior." Zimmer resigned the following day.

60.    On or about September 26, 2019, Prigmore reported that he conducted an investigation into Clark's conduct from May 2019 until September 2019.

61.    Prigmore purported to have completed his investigation on September 20, 2019. Prigmore alleged he identified seven areas of concern, including: 1) failure to observe any written regulation or order prescribed by competent authority, 2) neglect of duty, 3) obstructing the reestablishment of CenturyLink's control of the Sidewinder,4) misrepresentation, 5) wrongful shutdown of the SSS.gov website, 6) conduct unbecoming against your colleagues, and 7) insubordination – failure to follow Prigmore's Directive regarding not accessing the Agency security firewall.

62.    During the investigation, neither Prigmore nor any other management official sought an interview with nor documents from Clark.

63.     Prigmore then issued a Notice of Proposed Removal on September 26, 2019, which largely mirrored the investigative report.

64.     Clark objected to all the aforementioned charges and specifications, and he rebutted the facts and characterization of events in detail in his response to the Notice of Proposed Removal on October 18, 2019.

65.     Reason 1, Specification 1 in the notice of proposed removal was "Failure to take corrective action in accordance with Federal Information Security Management Act (FISMA) requirements to address most of the IT security program deficiencies that impacted the agency's IT security program in FY 2018.

66.     In fact, Clark had identified corrective actions on all four issues, which he presented at the Director's FISMA briefing on or about May 10, 2019.

67.     The first of these issues is "United States Government Configuration Baseline Compliance (USGCB) Compliance (Configuration Management Control)." The issue cited had been resolved as to Windows 7. However, the Agency was in the process of converting all of its computers to Windows 10. This information had been provided to the Auditor.

68.     The second of these issues is "RCV Production Servers not scanned directly (vulnerability scanning program)." Zimmer made the decision not to perform these scans. Clark stated at the time that he disagreed with this decision. But the decision was ultimately the responsibility of Zimmer.

69.     The third of these issues is "Contingency Plans need strengthening." This deficiency called for more context to be added to SSS's Continuity of Operations Plan (COOP). In fact, the COOP had been completed; it simply needed more context to be added to it. Clark

14

had worked to provide this additional context, as called for in the 2018 FISMA Audit. Further, the COOP is a "living document," and so there are always updates to be made to the COOP.

70.     The fourth of these issues is "No periodic review of access authorities for Service Type Accounts." This issue fell within the purview of Soucie. Essentially, the Helpdesk Team had not adequately reviewed accounts and deleted them as necessary. However, the Team had begun to take action to correct this deficiency.

71.     Additionally, due to the administrative leave that Prigmore imposed upon Clark on or about May 14, 2019, followed by the "special detail" to which Prigmore assigned Clark on or about May 21, 2019, it became impossible for Clark to work to establish any further solutions after May 14, 2019.

72.     Reason 1, Specification 2 was "Failure to comply with the National Institute of Standards and Technology (NIST) and Federal Information Processing Standards (FIPS) requirements."

73.     Clark worked at SSS for just over ten years, and the FIPS 199 Assessment was never his direct responsibility. The FIPS 199 Assessment always remained the responsibility of the Chief Information Officer. Thus, it was not the responsibility of Clark to perform or complete the FIPS 199 Assessment. Further, Clark assisted with the completion of the FIPS 199 Assessment in early March 2019, and Clark provided such assistance because Prigmore, the Chief Information Officer, requested it.

74.     Reason 1, Specification 3 was "Failure to maintain required documentation."

75.     The establishment of security policies fell within the purview of the Chief Information Officer who was John Prigmore. 40 U.S.C. § 11315 states, in part:

> The Chief Information Officer of an executive agency is responsible for providing advice and other assistance to the head of the executive

agency and other senior management personnel of the executive agency to ensure that information technology is acquired and information resources are managed for the executive agency in a manner that implements the policies and procedures of this subtitle, consistent with chapter 35 of title 44 and the priorities established by the head of the executive agency.

76.     Likewise, Executive Order 13833, signed by President Trump on May 15, 2018, states, in part, "consistent with 40 U.S.C. 11319(b)(1)(A), the CIO has a significant role, including, as appropriate, as lead advisor, in all annual and multi-year planning, programming, budgeting, and execution decisions, as well as in all management, governance, and oversight processes related to IT." Exec. Order No. 13833, 83 Fed. Reg. 23345 (May 15, 2018).

77.     The specification also accused Clark of failure to have printouts of the firewall configuration. But the documentation of the configurations may be printed from the firewall itself by any administrator with access. As a matter of course, systems and network administrators at SSS did not maintain printouts of configurations.

78.      The specification further accused Clark of a failure to provide documentation related to "CenturyLink." Clark provided the documentation he had at the time, and CenturyLink also admitted that it had not provided services, just as Clark stated.

79.     Reason 2 was "Neglect of Duty."

80.     Reason 2, Specification 1 was "Failure to manage the Agency's Sidewinder IT Security Firewall."

81.     The firewall in question had been under control for the past nine years, and no issues arose with the firewall until recent changes to the network in 2018 and 2019. Clark had worked with CenturyLink in the from at least 2017 to 2019 in an attempt to resolve the issue of CenturyLink's inability to connect to the firewall and manage it. CenturyLink failed to contact Clark, and it also failed to respond further to Clark's requests. The specification also alleged that

Clark had not raised the issue with leadership previously. But Clark had brought this issue to the attention of the Chief Information Officer, and Clark also reported this matter to Adam Copp in January 2018. Additionally, Clark raised the issued at least two years prior, and CenturyLink had failed to fix the issue. In CenturyLink's absence, Clark managed the firewall.

82.     The specification further accused Clark of having provided inaccurate information to Prigmore about the firewall and its status. In fact, Clark's report to Prigmore about the firewall was correct, and Clark provided Prigmore with this information so that Prigmore could take the appropriate action in response.

83.     Reason 2, Specification 2 was "Failure to fulfill CISO your duties [sic] by allowing an outdated DMZ switch which was over 7 years beyond service life to stay on the Agency's network."

84.     Clark had previously disclosed concerns about the necessity of a replacement DMZ switch. But in previous years, there had not been enough money in the Selective Service's budget for a replacement. In 2019, there was finally additional money in the budget, to the tune of about $3.5 million for such efforts, including the replacement. The Agency received those extra appropriations, in large part, because of Clark's efforts.

85.     Reason 3 was "Obstructing the re-establishment of CenturyLink's control of the Sidewinder."

86.     In fact, Clark was the employee who disclosed concerns about CenturyLink's failure to connect to the Sidewinder in the first place. Throughout April 2019, Clark worked with CenturyLink to attempt to reconnect CenturyLink to the Sidewinder Firewall. And it took almost two weeks to reestablish the connection. The breakdown in the ability to connect was due to problems with IT protocols that could not be resolved easily. The firewall vendor, Sidewinder,

had to work to resolve these unique issues, and that work required CenturyLink and Clark to make changes to allow for workarounds. The inability of the firewall to connect with CenturyLink was unlike any that either Clark or the technicians from CenturyLink had ever seen. Clark provided proposals and attempted to work cooperatively with CenturyLink. During this period, at least ten technicians actively worked on this problem, and they did so for two weeks. None of these technicians ever observed or alleged any "obstruction" on Clark's part.

87.     Reason 4 was "Misrepresentation."

88.     Reason 4, Specification 1 stated:

> You incorrectly claimed to the Agency Director in your "Director's Monthly Brief" that Issues 3 and 4 of the FISMA audit were complete on 15 April 2019 and 26 April 2019, respectively. You also briefed that Issue 1 and 2 would be completed by the 3rd week in April (2019) and mid-July (2019). Yet the 2019 FISMA Report stated that none of the four (4) issues were completed. Your statements were clearly inaccurate and misleading on highly material issues. The result is that the Agency in [sic] not currently in compliance with the Federal Information Security Management Act, placing it at a serious risk of an IT security breach.

89.     The dates that Clark provided to the Director were target dates to finish a task. Numerous factors played a role in whether the Agency met target dates. Such factors included, but were not limited to, resources and staff not under Clark's control. And during the time period just before the Agency removed Clark from most of his duties, sufficient staff members were not available to implement all of the configuration changes that were necessary. Prigmore, who ultimately had responsibility for compliance with FISMA, did not make compliance with the FISMA recommendations a priority. And Clark did not have the authority to order staff not under his control to perform tasks. Further, when Clark urged Soucie to perform certain tasks that included the disabling of accounts and baseline documentation for SSS workstations, Soucie complained to Zimmer in or about March 2019. Zimmer subsequently ordered Clark not to give

further direction to Soucie.

90.     Additionally, Prigmore placed Clark on four days' leave on May 14, 2019, and when Clark returned, Prigmore placed Clark on a "special detail' on May 21, 2019, which removed Clark's previous duties and system access, thereby making it impossible for Clark to work to resolve outstanding FISMA issues.

91.     Reason 4, Specification 2 was, "Inaccurate claims in support of the Sidewinder Firewall."

92.     The information in question that Clark provided came from third-party reports based upon research performed by others. Clark then drew upon his own experience and knowledge to formulate an opinion. And Prigmore did not task anyone else with similar requirements to perform research to substantiate their positions.

93.     Reason 4, Specification 3 was, "You inaccurately claimed that the government "mandates" physical separation via a DMZ switch in a letter to the Director."

94.     In this Specification, Prigmore accused Clark of having made an "intentionally or recklessly false statement." The Specification also alleged that Clark made this statement based on a purported "suspect desire for the agency to continue using the inferior Sidewinder firewall, even if it meant misleading the Agency."

95.     But Prigmore read only NIST SP 800-53. Clark relied on additional standards.

96.     Clark also relied upon NIST SP 800-41 Revision 1, *Guidelines on Firewalls and Firewall Policy*, which is available at

https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-41r1.pdf. It states, in part:

> Many hardware firewall devices have a feature called DMZ, an acronym related to the demilitarized zones that are sometimes set up between warring countries. While no single technical definition exists for firewall DMZs, they are usually interfaces on a routing firewall that are similar to the

19

> interfaces found on the firewall's protected side. The major difference is that traffic moving between the DMZ and other interfaces on the protected side of the firewall still goes through the firewall and can have firewall protection policies applied.

NIST SP 800-41 at 3-2, ¶ 1.

97.     Clark also relied on NIST SP 800-44, *Guidelines on Security Public Web Servers*, which is available at https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-44ver2.pdf. It states, in part:

> A demilitarized zone (DMZ) describes a host or network segment inserted as a "neutral zone" between an organization's private network and the Internet.  It prevents outside users of the Web server from gaining direct access to an organization's internal network (intranet).  A DMZ mitigates the risks of locating a Web server on an internal network or exposing it directly to the Internet.

NIST SP 800-44 at 8-1, § 8.1.2. Figure 8-3, within SP 800-44, depicts the configuration that SSS had for at least 9 years. *Id*. at 8-3.

98.     NIST SP 800-47, Security Guide for Interconnecting Information Technology Systems, is available at https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-47.pdf. It states, in part:

> Firewalls: Firewalls determine whether data packets are permitted into a network, and they restrict access to specific resources.  Install firewalls to protect internal networks and other resources from unauthorized access across the interconnection, or configure existing firewalls accordingly.  If the interconnection involves the use of servers, host them in a separately protected "demilitarized zone" (DMZ), which may be accomplished by installing two firewalls: one on the external line and one at the connection to internal networks.  (Alternately, a firewall could be installed on the external line and a security portal installed at the internal connection.)  Ensure firewall ports are configured properly and change all default passwords. See NIST Special Publication 800-41, *Guidelines on Firewalls and Firewall Policy*, for more information.

NIST SP 800-47 at 4-2, §4.2.1, ¶ 2.

99.     Reason 4, Specification 4 was "Your inaccurate claims about security of the DMZ

switch vs. Private VLAN."

100.    The statements that Clark made were true, and he reasonably believed that the configuration in question supported by Soucie placed the Agency in danger of a security breach. Specifically, Clark stated that the act of placing all incoming connections from external networks on the internal switch, while removing the screening buffer, could allow traffic to touch the physical internal network without proper scrutiny. Further, due to this disagreement, Clark recommended that the Selective Service consult with the Department of Homeland Security in order to obtain DHS's input. Clark made this suggestion because of the high importance and concern he held about the proposals in question supported by Soucie. The Agency failed to act on this recommendation and merely deemed Clark's disclosure nefarious.

101.    Reason 4, Specification 5 stated:

> Your inaccurate claim in Appendix G: Agency Comments to the Security Architecture Review (SAR) Report conducted by the Department of Homeland Security that "FIPS 199 does exist and was last updated in 2017. Auditor reviews yearly." The DHS Adjudication Response stated that FIPS 199 "Was not provided, nor demonstrated during the assessment as being used." Since you could not provide the completed FIPS 199, which should have been an easy task, the only logical conclusion that can be drawn is that it did not exist. DHS identified the failure to provide the FIPS 199 as a major cyber security risk to the Agency. This likely explains your inaccurate statement that it existed.

102.    Clark made the statement in question in March 2019. In making the statement, Clark referenced the FIPS 199, which the Agency had completed in 2017. Clark was on leave during the applicable DHS questioning and document request period. DHS was aware of Clark's upcoming absence, and in response, DHS asked other IT members to provide the documents they requested. DHS finished its SAR evaluation in or about December 2018. The United States Government was on shutdown status during all of January 2019.  When the Agency received System Architecture Review (SAR) results in about February or March 2019, Clark told

21

Prigmore and Zimmer that the Agency did have a FIPS 199 document. DHS said the Agency did not have such a document in its SAR report, but it based this assessment on its questioning of other employees.

103.    Clark later found the 2017 version on the Sharepoint site in the IT document section after he spoke to Zimmer and Prigmore about the report. This document had been created by one of the last two CIOs (either Jones or Klotz). It had not been updated in 2018, as neither Klotz nor Jones worked at the Selective Service as CIO in 2018. Other members of IT could not tell DHS where this document was or if it existed at all. And DHS never asked Clark for that document. Moreover, all responses made by Clark to DHS for the purpose of the SAR went to Prigmore and Zimmer for approval before leaving the Agency.

104.    Reason 5 was "Your wrongful shutdown of the SSS.gov website."

105.    Clark did not shut down the website on March 21, 2019. The only time in his career that Clark ever intentionally shut down the website was in or about June 2009 during a series of "bot attacks" on federal government entities. Prigmore's evidence underlying this accusation relied entirely on the statements of Soucie and Anthuan Nguyen. And the specification accused Clark of having edited or deleted firewall logs without any actual evidence that Clark did so. Further, the firewall logs can show deletions or edits, yet Prigmore cited no such evidence.

106.    In fact, both the network and the website did stop functioning properly on or about March 21, 2019. Soucie had been placed in charge of networks in Fall 2018. As part of these duties, Soucie began to redesign networks in Fall 2018 and Fall 2019, albeit without guidance from Clark first as to potential security implications. At or about 7:00 PM on March 21, 2019, Clark received a phone call from Perry Chaplin who stated that the network had "gone

22

down." This was the first time at which Clark became aware of the outage. On a troubleshooting call, Soucie informed Clark that he planned to get rid of the DMZ switch. Clark informed Soucie that the government generally requires a physical separation or DMZ Switch between networks. Clark also told Soucie that changes like the one he intended should be carefully planned and designed well ahead of time. Clark told Mr. Soucie that, as the Chief Information Security Officer, he should have been informed of the plan to remove the DMZ switch. The removal of a DMZ switch requires a significant number of configuration changes, and it is not an act that should be done without careful planning of all stakeholders involved.

107. Later that evening, Clark went to the office to troubleshoot. While at the office, Clark discovered that Soucie had reconfigured the networks so that outside traffic could avoid the firewall. Clark emphasized that he believed this was a significant security issue. Clark worked diligently to restore service, and he ultimately restored connectivity at or around 11:00 PM. Clark subsequently wrote his memorandum to Benton about his concerns on or about March 22, 2019.

108. Reason 6 was "Conduct unbecoming against your colleagues."

109. Reason 6, Specification 1 stated, "You wrongfully shut down the Agency's Network and affixed blame on co-workers."

110. On or about May 9, 2019, Clark investigated why the network was not working properly after he received a report from LaMothe that the network was down. Clark first attempted to troubleshoot the issue via the use of pings and trace-routes. Clark then went to the server room. When he did so, Clark discovered the external network connection from CenturyLink had been plugged into the internal switch, which meant there was a bypass of the firewall. Clark likewise discovered that the configuration meant that QRadar could not

23

adequately log incoming threats. Clark raised the concerns he did on May 9, 2019 in an effort to disclose what he believed to be significant concerns. The details included in this report were authentic and true based upon what Clark witnessed.

111.    This specification also purported to rely upon a change reflected in the QRadar log as evidence of Clark's wrongdoing. But lone access via the root account is not possible unless one stands at the server. The specification relies upon a vague log that cannot be interpreted without other supporting evidence.

112.    Reason 6, Specification 2 is, "Your wrongful shutdown of Agency security cameras and blaming your co-workers to damage their reputations."

113.    The specification states as evidence of Clark's purported malfeasance that Clark could be seen on the cameras on or about March 21, 2019 at or about 10:12 PM before the camera functionality failed and was the first person seen on the cameras when their functionality returned on March 28, 2019.

114.    When Clark went to SSS headquarters on the night of March 21, 2019 to restore the network, he did not check the camera connections, as he had no reason to believe anything had changed with the camera configuration. Clark worked in the server room that night until almost 11:00 PM. Clark took no actions related to the cameras because he had no reason to suspect there was a problem with the cameras.

115.    When Clark first learned of the camera outage on March 28, 2019, he went to the server room, and he then found that the cameras had been plugged into the wrong port. He moved the connection to the correct port, and the camera functionality restored. Moreover, Nguyen later acknowledged that he had been instructed to move camera configurations.

116.    Clark contacted the Office of Special Counsel on or about September 26, 2019

and disclosed that he believed he had been retaliated against for protected disclosures in violation of the Whistleblower Protection Act.

117. Benton issued a Decision of Removal on November 14, 2019, and it became effective on November 15, 2019.

118. In that decision, Benton sustained Reasons 1 through 6, and he sustained all of the specifications underlying each reason. Benton did not sustain the seventh specification, which related to a purported failure by Clark to follow Prigmore's directive not to access the Agency's security firewall.

119. On December 12, 2019, Clark filed a mixed-case direct appeal of his removal with the MSPB.

120. On February 25, 2020, an administrative judge for the MSPB granted the Selective Service's motion and dismissed Clark's appeal without prejudice pending United States Senate confirmation of sufficient Board members to reconstitute a quorum.

121. On March 31, 2020, the MSPB's initial decision became final, making this action ripe for judicial review and enforcement.

## COUNT I
### Failure of the Agency to Meet its Burden to Show that Removal Promotes the Efficiency of the Service
### 5 U.S.C. § 7513(a)

163. Clark incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

164. Under pertinent regulations, an agency may take an action against an employee only for such cause as will promote the efficiency of the service.  5 U.S.C.A. § 7513(a).

165. The Agency cannot show that Clark's removal promotes the efficiency of the service.

166.    Clark was a 10-year employee of the Agency with successful performance ratings and no record of performance issues or discipline until the arrival of Zimmer and Soucie.

167.    The evidence relied upon by the Agency to justify Clark's removal false, incomplete, and lacks appropriate context.

168.    Each action taken against Clark prior to the removal, and the removal itself, were also illegal, either as reprisal for Clark's whistleblowing and as part of a hostile work environment under the Whistleblower Protection Act.

169.    On October 18, 2019, Clark submitted a detailed response to the Notice of Proposed Removal issued to him by the Agency on September 26, 2019, which fully detailed the true nature and context of the allegations contained in the Notice.

170.    The Selective Service's decision to remove Clark from the federal service did not promote the efficiency of the service and was disruptive to the Agency's functionality.

171.    As a result of the Agency's unlawful removal, Clark has suffered damages.

## COUNT II
### The Whistleblower Protection Act
### Retaliation for Whistleblowing
### 5 U.S.C. § 2302(b)(8)

172.    Clark hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

173.    Clark engaged in protected activity under the WPA by disclosing what he reasonably believed to be violations of law, rule, or regulation; gross mismanagement; abuse of authority; and a substantial and specific danger to public health or safety.

174.    Specifically, Clark engaged in protected activity under 5 U.S.C. § 2302(b)(8) when

a.    Clark disclosed Soucie's actions which caused the loss of the Selective Service

26

emails in March 2018 and which exposed the Agency to other vulnerabilities. Clark first reported Soucie's errors in March 2018 in a report to Benton and then again in June 2018 in a performance review for Soucie;

b.       On or about July 8, 2018, Clark detailed concerns about Zimmer's IT suggestions and practices in an email to Benton, as well as concerns about Zimmer's disparaging Clark's work to Prigmore and concerns about Zimmer's use of racist language in the workplace;

c.       On or about August 31, 2018, Clark disclosed to Benton that he believed Benton's directive to cease the operation of certain security programs could place the security of the agency at risk, and in turn, place the public at risk of harm from a potential data breach;

d.       On or about March 22, 2019, Clark disclosed to Benton that Soucie's plan to remove the DMZ switch from the network without proper consultation could have put sensitive agency records at serious risk of loss or compromise;

e.       On or about May 9, 2019, Clark sent Benton a memorandum detailing the "network change incident," as well as a bypass of the CenturyLink firewall that Clark had discovered, which compromised security and violated NIST network security standards;

f.       On or about May 14, 2019, Clark met with Soucie and Prigmore about the network configuration, and he later sent an email to Prigmore in which he detailed his concerns that the network configuration in place, as directed by Soucie and Zimmer, was inadequate to meet security challenges and posed a significant security risk to the Agency;

g.       On or about May 22, 2019, Clark sent an email to Benton in which he reiterated

his concerns that the new network configuration did not adequately protect the network and violated NIST network security standards.

175. The Agency engaged in a prohibited personnel practice when it removed Clark from his employment on November 15, 2019.

176. Clark's protected activity was a contributing factor in the Agency's prohibited personnel practices.

177. The Agency's decision to remove Clark has its genesis in Clark's protected disclosures.

178. The temporal proximity between Clark's protected activity and his removal, coupled with the fact that the officials who proposed and affirmed his removal were the recipient of Clark's protected disclosures, satisfies the knowledge/timing test.

179. The Agency cannot show by clear and convincing evidence that it would have removed Clark in the absence of his protected activity.

180. Clark has sustained damages as a result of the Agency's illegal retaliation in violation of the Whistleblower Protection Act.

## COUNT III
### The Whistleblower Protection Act
### Hostile Work Environment
### 5 U.S.C. § 2302(b)(8)

181. Clark hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

182. Clark engaged in protected activity under the WPA by disclosing what he reasonably believed to be violations of law, rule, or regulation; gross mismanagement; abuse of authority; and a substantial and specific danger to public health or safety.

183.    Specifically, Clark engaged in protected activity under 5 U.S.C. § 2302)(b)(8) when:

a.    Clark disclosed Soucie's actions which caused the loss of the Selective Service emails in March 2018 and which exposed the Agency to other vulnerabilities. Clark first reported Soucie's errors in March 2018 in a report to Benton and then again in June 2018 in a performance review for Soucie;

b.    On or about July 8, 2018, Clark detailed concerns about Zimmer's IT suggestions and practices in an email to Benton, as well as concerns about Zimmer's disparaging Clark's work to Prigmore and concerns about Zimmer's use of racist language in the workplace;

c.    On or about August 31, 2018, Clark disclosed to Benton that he believed Benton's directive to cease the operation of certain security programs could place the security of the agency at risk, and in turn, place the public at risk of harm from a potential data breach;

d.    On or about March 22, 2019, Clark disclosed to Benton that Soucie's plan to remove the DMZ switch from the network without proper consultation could have put sensitive agency records at serious risk of loss or compromise;

e.    On or about May 9, 2019, Clark sent Benton a memorandum detailing the "network change incident," as well as a bypass of the CenturyLink firewall that Clark had discovered, which compromised security and violated NIST network security standards;

f.    On or about May 14, 2019, Clark met with Soucie and Prigmore about the network configuration, and he later sent an email to Prigmore in which he detailed his concerns that the network configuration in place, as directed by Soucie and Zimmer, was

29

inadequate to meet security challenges and posed a significant security risk to the Agency;

g.      On or about May 22, 2019, Clark sent an email to Benton in which he reiterated his concerns that the new network configuration did not adequately protect the network and violated NIST network security standards.

184.    The Selective Service, through its managers, intimidated, ridiculed, insulted, and harassed Clark when Zimmer and Soucie engaged in a pattern of behavior designed to call into question Clark's ability to perform the functions of his job after Clark made protected disclosures under the Whistleblower Protection Act.

185.    The Selective Service, through its managers, intimidated, ridiculed, insulted, and harassed Clark when Prigmore: placed Clark on administrative leave in May 2019, assigned Clark to a special detail in May 2019, conducted an investigation into Clark's conduct from May 2019 through September 2019, and proposed Clark's removal on September 26, 2019.

186.    The Selective Service's decision to remove Clark on November 15, 2019 was the final and last link in a chain of actions taken against Clark to intimidate, ridicule, insult, and harass him based upon his status as a whistleblower under the Whistleblower Protection Act.

187.    Clark's protected disclosures were a contributing factor in the series of actions taken by the Selective Service to intimidate, ridicule, insult, and harass Clark.

188.    The Selective Service's pattern of intimidation, ridicule, insult, and harassment toward Clark began within close proximity to Clark's first protected disclosures and continued through Clark's removal.

189.    The Selective Service, through its management, nurtured and encouraged an environment of animus toward whistleblowers that was sufficiently severe and pervasive to

subject Clark to a hostile work environment based upon his status as a whistleblower.

190.     The hostile work environment at the Selective Service altered the terms and conditions of Clark's employment.

191.     The Selective Service cannot show by clear and convincing evidence that it would have engaged in this same pattern of conduct toward Clark in the absence of his protected activity.

192.     Due to the Selective Service's unlawful violation of the Whistleblower Protection Act, Clark has suffered damages.

**COUNT IV**
**The Whistleblower Protection Act**
**Retaliation for Whistleblowing**
**5 U.S.C. § 2302(b)(9)**

193.     Clark hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

194.     Clark engaged in protected activity under 5 U.S.C. § 2302(b)(9) in September 2019 Clark filed a complaint with the OSC.

195.     The Selective Service System engaged in a personnel practice prohibited under the Whistleblower Protection Act when it removed Clark from his employment on November 15, 2019.

196.     Clark's protected activity was a contributing factor in the Selective Service's prohibited personnel practice.

197.     Clark's termination satisfies the knowledge/timing test.

198.     The Agency cannot show by clear and convincing evidence that it would have removed Clark in the absence of his protected activity.

199.     Clark has sustained damages as a result of the Agency's illegal retaliation in

violation of the Whistleblower Protection Act.

## **PRAYER FOR RELIEF**

WHEREFORE and for the foregoing reasons, Clark respectfully requests that this

Court grant Clark the following relief including, but not limited to:

a.      Back pay, bonuses, and related benefits;

b.      Reinstatement to all original conditions of Clark's employment;

c.      Front pay;

d.      Reasonable and foreseeable compensatory and consequential damages;

e.      Reasonable attorneys' fees and costs;

f.      Corrective action against management for whistleblower retaliation;

g.      Corrective action against management for race discrimination and retaliation;

h.      Ensuring that Clark's workplace is free of future discrimination and retaliation; and

i.      Any other relief this Honorable Court deems just and proper to award.

Respectfully Submitted,

/s/ Andrew Dylan Howell
Andrew D. Howell
R. Scott Oswald
The Employment Law Group, PC
888 17th Street NW
Floor 9
Washington, DC 20006
(202) 261-2829
dhowell@employmentlawgroup.com
soswald@employmentlawgroup.com

32